1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

10

JOSEPH CROWE,

CASE NO.     C05-5391RJB

11
                   Plaintiff,

REPORT AND
RECOMMENDATION

12
    v.

13

JO ANNE B. BARNHART, Commissioner of
Social Security,

Noted for February 17, 2006

14
15
                  Defendant.

16
17

18    Plaintiff, Joseph Crowe, has brought this matter for judicial review of the denial of his application

19  for supplemental security income ("SSI") benefits.  This matter has been referred to the undersigned

20  Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as

21  authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties'

22  briefs and the remaining record, the undersigned submits the following report and recommendation for the

23  Honorable Robert J. Bryan's review.

                  FACTUAL AND PROCEDURAL HISTORY

24    Plaintiff currently is forty-nine years old.[1] Tr. 31.  He has a ninth grade education and past work

25
26  experience as a forklift driver, a molder, an auto dismantler, and a tire remover. Tr. 18, 168, 173.

27
28
      [1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access
to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

On July 28, 2000, plaintiff filed an application for SSI benefits, which was denied initially and on reconsideration. Tr. 17, 31-32, 36, 41, 73-76.  No further action was taken with respect to this application. Tr. 17.  Plaintiff filed another application for SSI benefits on July 9, 2001, which was denied at the initial level and again appealed no further. Tr. 17, 33, 44, 77.

On July 1, 2002, plaintiff filed a third application for SSI benefits, alleging disability as of June 15, 1998, due to having had three heart attacks, emphysema, asthma, a learning disability, substance abuse, and depression. Tr. 18, 82-84, 167.  His application was denied initially and on reconsideration. Tr. 34-35, 48, 56.  He requested a hearing, which was held before an administrative law judge ("ALJ") on March 3, 2004. Tr. 426.  Plaintiff, represented by counsel, appeared and testified at the hearing, as did a medical expert. Tr. 426-46.

On July 7, 2004, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1)     at step one of the disability evaluation process, plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;

(2)     at step two, plaintiff had "severe" impairments consisting of coronary artery disease, borderline intelligence and substance abuse in remission by report;

(3)     at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)     at step four, plaintiff had the residual functional capacity to perform light work, with certain other non-exertional limitations; and

(5)     at step five, a finding of "not disabled" was directed by 20 C.F.R. Part 404, Subpart P, Appendix 2, § 202.17.

Tr. 29-30.  Plaintiff's request for review was denied by the Appeals Council on April 27, 2005, making the ALJ's decision the Commissioner's final decision. Tr. 7; 20 C.F.R. § 416.1481.

On June 8, 2005, plaintiff filed a complaint in this court seeking review of the ALJ's decision. (Dkt. #1 and #5).  Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits for the following reasons:

(a)     the ALJ made a *de facto* reopening of plaintiff's prior SSI benefits applications;

(b)     the ALJ erred in not finding plaintiff's depression, learning disorder and chronic obstructive pulmonary disease ("COPD") to be "severe";

(c)     the ALJ erred in evaluating the medical source opinion evidence in the record;

(d)     the ALJ failed to consider whether any of plaintiff's impairments met or equaled the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04 or § 12.05;

(e)     the ALJ erred in assessing plaintiff's credibility;

(f)     the ALJ erred in evaluating the lay witness evidence in the record;

(g)     the ALJ erred in assessing plaintiff's residual functional capacity;

(h)     the ALJ erred in relying on 20 C.F.R. Part 404, Supart P, Appendix 2, § 202.17 to find him not disabled; and

(i)     the ALJ failed to develop the record.

In his opening brief, plaintiff also amends his alleged onset date of disability to July 28, 2000. Plaintiff's Opening Brief, p. 1, n.1. The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that this matter be remanded to the Commissioner for further administrative proceedings. While plaintiff also has requested oral argument in this matter, the undersigned finds such argument to be unnecessary here.

## DISCUSSION

This court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.      The ALJ Made a *De Facto* Re-Opening of Plaintiff's Prior SSI Applications

Judicial review of the Commissioner's administrative decisions is governed by Section 405(g) of the Social Security Act, which reads in relevant part:

Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow.

42 U.S.C. § 405(g); see also Udd v. Massanari, 245 F.3d 1096, 1098 (9th Cir. 2001) (judicial review limited to final decision made after hearing). The Commissioner's regulations, however, "allow for further consideration of an application by providing for the reopening of an agency determination." Panages v. Bowen, 871 F.2d 91, 92 (9th Cir. 1989). Under those regulations, "[a] claim may be reopened within 12 months of the initial determination as a matter of right, within four years 'upon a finding of good cause,' and at any time for the purpose of correcting clear evidentiary errors or clerical mistakes." Id. (quoting and citing 20 C.F.R. §§ 404.988-404.989).

The Commissioner may apply administrative *res judicata* "to bar reconsideration of a period with respect to which she has already made a determination, by declining to reopen the prior application." Lester v. Chater, 81 F.3d 821, 827 (9th Cir. 1996). In general, the Commissioner's refusal to reopen a decision regarding an earlier period "is not subject to judicial review." Id. This is because, once an administrative decision becomes final, the Commissioner's decision to reopen a disability claim is "purely discretionary." Taylor v. Heckler, 765 F.2d 872, 877 (9th Cir. 1985). Further, since a discretionary decision is not a "final decision" within the meaning of 42 U.S.C. § 405(g), the Commissioner's refusal to reopen that decision "is not a 'final' decision subject to judicial review." Id. (citations omitted).

The doctrine of *res judicata* "should not be rigidly applied in administrative proceedings." Lester v. Chater, 81 F.3d 821, 827 (9th Cir. 1996); Chavez v. Bowen, 844 F.2d 691, 693 (9th Cir. 1988) (*res judicata* applied less rigidly to administrative proceedings than to judicial proceedings). While administrative *res judicata* also should not be "applied so as to 'contravene an overriding public policy or result in manifest injustice,'" it is only "[w]here the record is patently inadequate to support the findings the ALJ made," that its application will be "tantamount to a denial of due process." Krumpelman v. Heckler, 767 F.2d 586, 588 (9th Cir. 1985) (quoting Thompson v. Schweiker, 665 F.2d 936, 940-41 (9th Cir. 1982)).

The exception to the above rule is "where the Commissioner considers 'on the merits' the issue of the claimant's disability during the already-adjudicated period." Lester, 81 F.3d at 827; Lewis v. Apfel, 236 F.3d 503, 510 (9th Cir. 2001). If "such a *de facto* reopening occurs, the Commissioner's decision as to the prior period is subject to judicial review." Lester, 81 F.3d at 827. However, "where the discussion of the merits is followed by a specific conclusion that the claim is denied on res judicata grounds, the decision should not be interpreted as re-opening the claim and is therefore not reviewable." Krumpelman, 767 F.2d

1    at 589 (citing <u>McGowen v. Harris</u>, 666 F.2d 60, 68 (4th Cir. 1981)).

2        At the beginning of his opinion, the ALJ made the following statement:

3        Below is a summarized chronology of the salient medical evidence in the record.  While
         the evidence discussed below may refer to evidence dated prior to the claimant's current
4        alleged date of disability, June 15, 1998, these references are merely used to establish a
         longitudinal picture of the claimant, and do not constitute an implied reopening of his
5        previous claims.

6    Tr. 19.  Plaintiff argues the above statement constitutes a *de facto* re-opening of his prior applications for

7    SSI benefits.  The undersigned agrees.  Plaintiff's first application, which was denied in early March 2001,

8    alleged an onset date of disability of December 31, 1989, and his second application, which was denied in

9    early December 2001, alleged an onset date of 1996. Tr. 41, 44, 73, 77.  In his current application, plaintiff

10   alleged an onset date of disability of June 15, 1998. Tr. 82.  As noted above, it is from this date that the ALJ

11   stated he was considering plaintiff's allegations of disability.  As such, the ALJ necessarily had to consider a

12   period of time that occurred prior to the final determinations of plaintiff's previous applications, and, thus,

13   despite his statement to the contrary, he re-opened those applications.

14   II.    <u>The ALJ Erred in His Step Two Analysis</u>

15       To determine whether a claimant is entitled to disability benefits, the ALJ engages in a five-step

16   sequential evaluation process. 20 C.F.R. § 416.920.  At step two of that process, the ALJ must determine if

17   an impairment is "severe".  <u>Id.</u>  An impairment is "not severe" if it does not "significantly limit" a claimant's

18   mental or physical abilities to do basic work activities. 20 C.F.R. § 416.920(a)(4)(iii), ( c); Social Security

19   Ruling ("SSR") 96-3p, 1996 WL 374181 *1.  Basic work activities are those "abilities and aptitudes

20   necessary to do most jobs." 20 C.F.R. § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

21       An impairment is not severe only if the evidence establishes a slight abnormality that has "no more

22   than a minimal effect on an individual[']s ability to work."  <u>See</u> SSR 85-28, 1985 WL 56856 *3; <u>Smolen v.

23   Chater</u>, 80 F.3d 1273, 1290 (9th Cir. 1996); <u>Yuckert v. Bowen</u>, 841 F.2d 303, 306 (9th Cir.1988).  Plaintiff

24   has the burden of proving that his "impairments or their symptoms affect his ability to perform basic work

25   activities." <u>Edlund v. Massanari</u>, 253 F.3d 1152, 1159-60 (9th Cir. 2001); <u>Tidwell v. Apfel</u>, 161 F.3d 599,

26   601 (9th Cir. 1998).  The step two inquiry described above, however, is a *de minimis* screening device used

27   to dispose of groundless claims.  <u>Smolen</u>, 80 F.3d at 1290.

28       The ALJ found plaintiff's borderline intelligence to be a severe impairment, but did not find any of

his other mental impairments to be severe. Tr. 20.  Plaintiff argues the ALJ erred in finding his depression

was not severe.  With respect to that impairment, the ALJ found specifically as follows:

> The claimant also alleged several other mental impairments, including bipolar disorder
> and depression as based on the report of psychiatrist, Clark T. Ballard, Jr., M.D. Ex.
> 11F.  However, Disability Determination Services (DDS) did not find these diagnoses
> supported by the record in that the claimant had "no definitive history of manic or hypo
> manic episodes or major depressive episodes.["] Ex. 12F.5.  At the hearing, and after a
> complete review of the record and hearing the claimant testify, the medical expert, Tracy
> Gordy, Ph.D., agreed with DDS. . . .
>
> Furthermore, the claimant testified that he was not taking any type of medication for his
> alleged mental symptoms, had not received any kind of mental health treatment, and
> reported at a consultative examination that he was "on chemicals at the time" he was
> diagnosed with bipolar disorder. Ex. 24F.2.

Tr. 20-21.  The undersigned agrees the ALJ erred in finding plaintiff's depression to be not severe, as the

above findings are not supported by the substantial evidence in the record.

In late April 2000, Brett Trowbridge, Ph.D., diagnosed plaintiff with borderline level intellectual

functioning, a reading and writing disability, and an adjustment disorder with a depressed and anxious

mood, which he found resulted in a number of moderate to severe mental functional limitations. Tr. 245-46.

During a psychiatric evaluation conducted by Dr. Ballard in late January 2001, plaintiff denied "much

depression currently," although he "described his mood as feeling depressed as a result of his younger

children's being in foster care." Tr. 291, 293.  He diagnosed plaintiff with bipolar disorder. Tr. 293.  In

terms of mental functional limitations, Dr. Ballard opined as follows:

> Regarding his work function, there is minimal to slight impairment in his ability to
> reason, comprehend and follow instructions and his ability to perform simple and
> repetitive tasks.  His ability to maintain sustained concentration and persistence is
> markedly limited.  Due to his cardiac condition, back pain and mood disorder, there
> appears to be moderate impairment in his ability to maintain a work pace appropriate to
> a given workload.  It seems that due to the thought disorder associated with the
> affective disorder he has moderate impairment in his ability to perform complex or
> varied tasks.  He has a slight impairment in his ability to relate to other people, beyond
> giving and receiving instructions and his ability to influence people.  There seems to be a
> slight to moderate impairment in his ability to make generalizations, evaluations, or
> decisions without immediate supervision.  He does seem capable of managing his own
> funds in his own best interest.

Tr. 294.  While Dr. Ballard based his findings on a diagnosis of bipolar, rather than depression, he did note

that plaintiff expressed some feelings of depression.

In early March 2001, Bruce Eather, Ph.D., a non-examining consulting psychologist, completed a

psychiatric review technique form, finding there to be insufficient evidence of a mental impairment prior to

Dr. Ballard's evaluation. Tr. 300, 312.  As of the date of that evaluation, however, he diagnosed plaintiff with a depressive disorder and a history of a reading learning disorder "per self-report." Tr. 304.  He further found plaintiff had a mild restriction in his activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. Tr. 310.  There was insufficient evidence in the record regarding episodes of decompensation. Id.  In a mental residual functional capacity assessment form Dr. Eather completed at the same time, he also found plaintiff had a number of more specific moderate mental functional limitations. Tr. 295-97.

Plaintiff was evaluated by Dr. Christine Suydam in early September 2001, who diagnosed him with depression. Tr. 330.  Dr. Suydam also provided the following mental functional assessment:

> Currently, he would be able to follow some work rules and relate to coworkers and supervisors for brief periods of time in a highly structured environment. . . . He is not currently in mental health treatment.  If he were to followup with mental health treatment, this could augment his ability to return to a higher functioning capacity.  Currently, however, his focus is on maintaining sobriety. . . . He does appear capable of managing funds.

Id.  In late November 2001, Thomas Clifford, Ph.D., completed a psychiatric review technique form in which he diagnosed plaintiff with a major depressive disorder. Tr. 334.  He also found plaintiff to have a moderate restriction in his activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and no episodes of decompensation. Tr. 341.  In a mental residual functional capacity assessment form completed at the same time, Dr. Clifford further found plaintiff to be moderately to markedly limited in a number of more specific mental functional areas as well. Tr. 344-47.

Dr. Tracy Gordy, the medical expert who testified at the hearing, gave a mixed opinion regarding plaintiff's alleged depression and bipolar disorder.  For example, Dr. Gordy noted Dr. Suydam's diagnosis of depression, but then testified that the record did not really support such a diagnosis. Tr. 443.  He made a similar comment concerning plaintiff's being diagnosed with bipolar disorder, noting that it was "probably if anything major depression or dysthymia." Id.  In terms of mental functional limitations, Dr. Gordy felt that plaintiff had mild restrictions in his activities of daily living, mild to moderate difficulties in social functioning, and one drug-related episode of decompentation. Tr. 444.  With respect to his concentration, persistence or pace, Dr. Gordy testified that plaintiff's limitation in that area "would approach marked" if Dr. Suydam's evaluation was considered. Id.  Overall though, in light of the above discussion, substantial

evidence in the record indicates plaintiff had significant mental functional limitations due at least in part to a diagnosed depressive disorder.

Plaintiff argues the ALJ also erred in not finding his learning disorder to be severe. However, the medical evidence in the record regarding the existence and severity of such a disorder is mixed. As noted above, Dr. Trowbridge diagnosed plaintiff with a reading and writing disability, stating he was "illiterate, intellectually 'slow' and poorly educated." Tr. 245-46. Also as noted above, it appears that Dr. Trowbrigde found him to have a number of moderate to severe mental functional limitations based at least in part on that diagnosis. Tr. 246. Neither Dr. Ballard nor Dr. Suydam, however, diagnosed plaintiff with any type of learning disorder, and Dr. Eather merely found he had a history of a reading learning disorder "per self-report." Tr. 304. As discussed below, furthermore, the ALJ did not err in discounting plaintiff's credibility. Dr. Clifford did opine that there was "a likelihood of borderline intellect," and that "[w]ithout benefit of formal intelligence testing," plaintiff had the "capacity for simple, non-public work." Tr. 343. However, he too did not find plaintiff had a learning disorder.

In early October 2002, a psychological evaluation was performed by Jeff Bremer, Ph.D., who found plaintiff to have borderline intellectual functioning. Tr. 386. Dr. Bremer, however, ruled out the presence of a learning disability. Id. Dr. Bremer went on to state as follows:

> Today's testing suggests that Mr. Crowe's general level of intellectual [sic] is fairly limited, in the borderline range. Academic testing . . . would be needed to determine the discrepancy between his learning ability (Full Scale IQ) and levels of academic achievement (reading, writing, and arithmetic), and hence support a diagnosis of Learning Disabiliy. In any case his academic skills appear to be quite limited – and probably always have been.

Tr. 387. Plaintiff appears to argue this shows that Dr. Bremer felt he had a learning disorder. However, a correct reading of the above statement would be that academic testing would be needed to support such a diagnosis. Thus, even though it appeared that plaintiff had "quite limited" academic skills, Dr. Bremer did not at this time find him to have a learning disorder per se.

Indeed, in early November 2002, Dr. Eather and Harold B. Johnston, Ph.D., another non-examining consulting psychologist, ruled out the presence of a learning disorder as well. Tr. 389. The medical expert who testified at the hearing, Dr. Gordy, also did not find plaintiff suffered from a learning disorder. Thus, as the evidence in the record regarding plaintiff's alleged learning disorder is mixed, it is unclear whether or not he suffers from such a disorder, nor is it clear to the extent that plaintiff does have a such a disorder that

it is severe for step two purposes.  Because the ALJ did not specifically address this alleged disorder in his decision though, it cannot be said the ALJ's interpretation of the evidence in the record regarding this issue was rational.  The Commissioner, therefore, shall re-determine this issue on remand.

Finally, plaintiff argues the ALJ erred in failing to find his chronic obstructive pulmonary disease ("COPD") to be severe.  Specifically, the ALJ found that the severity of plaintiff's breathing impairments to have been "contradicted by the record" and his "own actions," including his not being on preventative medications for his COPD and his inability to completely quit smoking. Tr. 21.  The undersigned finds the ALJ did not err here.  While the record does indicate that plaintiff has had some breathing problems, those problems have not always been present and for the most part have not resulted in significant work-related limitations. See Tr. 195-97, 210, 213, 216-17, 235, 237, 258, 273, 275, 281-82, 284, 287, 314-15, 323, 352, 362, 372, 379, 381.  Any restrictions in plaintiff's ability to function physically, furthermore, appear to be more related to his heart problems, as found by the ALJ (Tr. 25), rather than to his COPD. See Id. Indeed, despite his complaints of breathing problems and diagnoses of coronary artery disease, plaintiff reported that his activity level had been "good" in late June 2001. Tr. 314.

The findings of Dr. Ann Tosomeen upon which plaintiff primarily relies here, also fail to support his assertion that his COPD was severe.  For example, Dr. Tosomeen stated in late June 2002, that plaintiff had been "[n]ewly diagnosed" with COPD, but was not on any medications for it, and "left nipple pain" was reported to be "[h]is only acute problem" at the time. Tr. 372-73.  She diagnosed plaintiff with COPD in early August 2002, as well, but reported he felt "able to breathe better" following treatment. Tr. 369.  Larry Conover, PA-C, also assessed plaintiff with having "COPD exacerbation" on several occasions, but he too noted that plaintiff "seemed to be getting better" on medication. Tr. 412, 414, 416.

Defendant argues here, and also with respect to plaintiff's challenges to the ALJ's evaluation of the medical source opinion evidence in the record discussed below, that the ALJ's determination to not re-open plaintiff's prior applications was an application of *res judicata*, and thus bars further consideration of both those applications and the evidence which relates to those periods covered by those applications.  As such, defendant asserts the ALJ was not obligated to provide any reasons for rejecting such evidence.  However, as discussed above, the ALJ did re-open plaintiff's prior applications.  In addition, while an ALJ who properly does not re-open a prior application need not consider evidence in the record related to the period

1  considered by that application, defendant has provided no legal authority for the proposition that the ALJ

2  may do so with respect to evidence relating to a re-opened period or to a current application for disability as

3  is the case here.

4  III.  <u>The ALJ Erred in Evaluating the Medical Source Opinion Evidence in the Record</u>

5      The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

6  medical evidence. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the

7  record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the

8  ALJ. <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must

9  be upheld." <u>Morgan v. Commissioner of the Social Security Administration</u>, 169 F.3d 595, 601 (9th Cir.

10  1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact

11  inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts

12  "falls within this responsibility." <u>Id.</u> at 603.

13      In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

14  supported by specific, cogent reasons." <u>Reddick</u>, 157 F.3d at 725.  The ALJ can do this "by setting out a

15  detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

16  thereof, and making findings." <u>Id.</u>  The ALJ also may draw inferences "logically flowing from the evidence."

17  <u>Sample</u>, 694 F.2d at 642.  Further, the court itself may draw "specific and legitimate inferences from the

18  ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755, (9th Cir. 1989).

19      The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

20  either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

21  treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

22  legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31.  However, the

23  ALJ "need not discuss *all* evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>, 739

24  F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original).  The ALJ must only explain

25  why "significant probative evidence has been rejected." <u>Id.</u>; <u>see also</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07

26  (3d Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

27      In general, more weight is given to a treating physician's opinion than to the opinions of those who

28  do not treat the claimant. <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

1    a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or

2    "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190,

3    1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242

4    F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the

5    opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A nonexamining physician's opinion may

6    constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-

7    31; Tonapetyan, 242 F.3d at 1149.

8         Plaintiff argues the ALJ failed to give appropriate weight to the various medical source opinions in

9    the record.  For the most part, the undersigned agrees.  First, he argues the ALJ erred in failing to discuss

10   the various mental functional limitations found by Dr. Trowbridge.  As discussed above, Dr. Trowbridge

11   found plaintiff to have several moderate to severe mental functional limitations based on his diagnoses of

12   borderline intellectual functioning, reading and writing disability, and adjustment disorder with depressed

13   and anxious mood.  The ALJ though did not discuss Dr. Trowbridge's findings and opinion anywhere in his

14   decision.  However, because the ALJ found plaintiff's borderline intellectual functioning to be severe, and

15   because, also as discussed above, the evidence in the record, including Dr. Trowbridge's opinion, does

16   show plaintiff's depression, and possibly his alleged learning disorder, to be severe, it was improper for the

17   ALJ not to have considered that opinion.  The same is true with respect to the ALJ's failure to consider all

18   of the limitations found by Drs. Eather, Clifford, Johnston and Suydam as asserted by plaintiff.

19        With respect to the opinion of Dr. Ballard, the undersigned finds no error with the ALJ's rejection

20   of Dr. Ballard's diagnosis of bipolar disorder.  He is the only medical source in the record to diagnose him

21   with that impairment.  Indeed, Dr. Gordy, the medical expert, testified that there was nothing in the record

22   to support the bipolar disorder diagnosis, and that, if anything, plaintiff probably had major depression or

23   dysthymia. Tr. 443.  It appears though that at least some of the mental functional limitations Dr. Ballard

24   found plaintiff had were similar to those found by the other medical sources in the record discussed above.

25   In addition, also as discussed above, it seems that Dr. Ballard found at least some evidence that plaintiff was

26   suffering from depressive symptoms.  Therefore, the Commissioner on remand shall re-evaluate the mental

27   functional limitations found by Dr. Ballard as well to determine whether or not they should be adopted in

28   assessing plaintiff's alleged disability.

REPORT AND RECOMMENDATION
Page - 11

Plaintiff takes further issue with the ALJ's characterization of the testimony of the medical expert. First, plaintiff asserts the ALJ incorrectly stated that Dr. Gordy testified that plaintiff had only moderate difficulties in maintaining concentration, persistence or pace (Tr. 22), and that instead Dr. Gordy testified his limitation in this area "probably would approach marked" if Dr. Suydam's psychological evaluation was considered (Tr. 443-44). The undersigned agrees that the latter statement is what Dr. Gordy actually provided, but notes that Dr. Gordy felt the evidence in the record did not really support the diagnosis of depression provided by Dr. Suydam. Tr. 443. Thus, it is not entirely clear that Dr. Gordy actually believed plaintiff was so limited, or that the ALJ was required to adopt such that limitation. The undersigned also does not find that Dr. Gordy clearly testified that plaintiff had major depression or dysthymia. Rather, Dr. Gordy testified that "if anything," plaintiff had one of those impairments. Id.

Lastly, plaintiff argues the ALJ improperly rejected Dr. Tosomeen's opinion that he had COPD, in light of Mr. Conover's findings showing COPD exacerbations and his inability to afford the preventative medications for his COPD. As discussed above, however, the ALJ did not err in finding plaintiff's COPD to be non-severe. Specifically, while the record does indicate that plaintiff had some breathing difficulties, and later was diagnosed with COPD, it largely fails to show that he suffered from significant work-related limitations because of that condition. In addition, while it does appear that plaintiff has had difficulty in obtaining medication and treatment due to his financial situation, a factor relevant to the issue of plaintiff's credibility but not necessarily here, the record shows that such medication has been helpful. Tr. 369, 372. Thus, the undersigned does not find the ALJ erred in evaluating Dr. Tosomeen's opinion.

IV.     The ALJ's Step Three Analysis Was Proper

At step three of the evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R § 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999). If any of the claimant's impairments meet or equal a listed impairment, he or she is deemed disabled. Id. The burden of proof is on the claimant to establish he or she meets or equals any of the impairments in the Listings. Tacket, 180 F.3d at 1098.

A mental or physical impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20

C.F.R. § 416.908. It must be established by medical evidence "consisting of signs, symptoms, and laboratory findings." Id. An impairment meets a listed impairment "only when it manifests the specific findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248 *2. An impairment equals a listed impairment "only if the medical findings (defined as a set of symptoms, signs, and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed impairment." Id. at *2. However, "symptoms alone" will not justify a finding of equivalence. Id.

Listing 12.04 reads in relevant part as follows:

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following: . . .

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. Listing 12.05 reads as follows:

12.05 Mental retardation: Mental retardation refers to significantly subaverage general

intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

Or

B. A valid verbal, performance, or full scale IQ of 59 or less;

Or

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

Or

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

Plaintiff argues the ALJ erred in failing to properly consider whether he met or equaled the "B" and "C" criteria of Listing 12.04 and/or Listing 12.05. First, plaintiff argues the findings of Dr. Trowbridge, Dr. Ballard, Dr. Suydam, Dr. Bremer, and Mr. Conover support a finding that he has marked difficulty in maintaining social functioning and in maintaining concentration, persistence or pace. With respect to the area of concentration, persistence or pace, Dr. Trowbrige made no specific finding to the effect that he was markedly limited in this area. Tr. 246. Dr. Ballard did find him to be markedly limited in that area (Tr. 294), but, as discussed above, it is not clear the ALJ was required to adopt that limitation. Dr. Suydam, Dr. Bremer and Mr. Conover, furthermore, did not provide any opinion regarding plaintiff's ability to maintain concentration, persistence or pace. In addition, other medical evidence in the record indicates that he was not so limited in that area. See Tr. 295-96, 310, 341, 344-45, 398, 402-03.

With respect to plaintiff's ability to maintain social functioning, it does appear that Dr. Trowbridge found him to be markedly impaired in some areas of social functioning. Tr. 246.  Dr. Ballard though found plaintiff to have only a "slight" impairment in his ability to relate to other people. Tr. 294.  Although Dr. Suydam did note some significant difficulties relating to social functioning, it is not at all clear that she felt plaintiff was markedly limited in that area. Tr. 330.  Again, neither Dr. Bremer nor Mr. Conover provided any opinion with respect to plaintiff's possible limitations here.  Other medical source opinion evidence also for the most part indicates his limitations in this area are not nearly as limited as plaintiff has alleged. See Tr. 296, 299, 310, 341, 345, 347, 398, 403.  Accordingly, it does not appear that any of plaintiff's mental impairments met or equaled the "B" criteria of Listing 12.04.  Plaintiff also has not shown, nor does the record indicate, that any of those impairments met or equaled the "C" criteria of that Listing.  Plaintiff's assertion with respect to Listing 12.05, furthermore, borders on the frivolous, as there is no evidence in the record that he comes anywhere close to satisfying any of the criteria set forth in that Listing.

V.      The ALJ Properly Assessed Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  The court should not "second-guess" this credibility determination.  Allen, 749 F.2d at 580.  In addition, the court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief."  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

1  evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

2  testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

3  also may consider a claimant's work record and observations of physicians and other third parties regarding

4  the nature, onset, duration, and frequency of symptoms. Id.

5          Failure to assert a good reason for not seeking, or following a prescribed course of, treatment, or a

6  finding that a proffered reason is not believable, "can cast doubt on the sincerity of the claimant's pain

7  testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).  see also Meanal v. Apfel, 172 F.3d 1111,

8  1114 (9th Cir. 1999) (ALJ properly considered physician's failure to prescribe, and claimant's failure to

9  request serious medical treatment for supposedly excruciating pain); Johnson v. Shalala, 60 F.3d 1428,

10  1434 (9th Cir. 1995) (ALJ properly found prescription of physician for conservative treatment only to be

11  suggestive of lower level of pain and functional limitation).

12          Here, the ALJ noted that plaintiff had not received any kind of mental health treatment and was not

13  taking any type of medication for his mental impairments. Tr. 21.  Although there is some mention in the

14  record plaintiff had trouble obtaining medications for his physical impairments due to financial difficulties

15  (Tr. 294, 407, 412), while at other times he appears to have stopped taking them for other unexplained or

16  non-medically recommended reasons (Tr. 197, 210, 213, 237, 258, 320, 416), there is no indication this was

17  true with respect to obtaining medications for his mental health issues (Tr. 327, 414).  For example, Dr.

18  Ballard noted that plaintiff had been "self-medicating with drugs and alcohol." Tr. 294.  Nor does it appear

19  plaintiff has ever sought mental health treatment for his alleged disabling mental impairments, and he has

20  denied having a history of serious mental health issues. Tr. 291-92, 298, 312, 327.  Again, for example,

21  plaintiff told Dr. Bremer in early October 2002, that he could not work at the time based on his emphysema.

22  Tr. 383.

23          The ALJ also discounted plaintiff's credibility in part due to the fact that he continued to smoke. Tr.

24  21.  While it does appear as plaintiff asserts that he has been able to cut down significantly on the amount of

25  cigarettes he smokes on a daily basis (Tr. 195, 197, 210, 213-14, 234-35, 237, 258, 265, 270-71, 273, 275,

26  293, 328, 352, 369, 371-73, 414, 416), the fact is his treatment providers have recommended that he quit

27  smoking completely, which he has not done (Tr. 213, 234, 273, 373, 416).  That plaintiff comply with the

28  recommendation to stop smoking completely appears to be particularly important here, considering that his

allegations of disability are based in large part on his heart problems and breathing difficulties. Thus, the undersigned cannot fault the ALJ for discounting plaintiff's credibility in part for this reason.

Lastly, the ALJ discounted plaintiff's credibility in part because his activities of daily living were inconsistent with his allegations of severe breathing problems and an inability to concentrate. Tr. 21, 25. To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284. Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7. The claimant need not be "utterly incapacitated" to be eligible for disability benefits, and "many home activities may not be easily transferable to a work environment." Id.

The undersigned finds the substantial evidence in the record supports the ALJ's findings here. In early March 1997, plaintiff reported that it was "extremely unusual for him to have to rest walking" one-half mile. Tr. 197. In late January 2001, he reported that he was "able to provide for himself by preparing his own meals, doing his own shopping and laundry and keeping his apartment clean. Tr. 292. Plaintiff in early March 2001, was found to be independent in his activities of daily living, including all of the above activities. Tr. 312. In early September 2001, plaintiff reported that he sometimes goes to the park to play Frisbee. Tr. 329.

In early October 2002, plaintiff reported having done "mostly 'odd jobs'" during the past year, including "working on cars, raking leaves, mowing the lawn, [and] working in the garden." Tr. 384. He also reported that "[f]or fun," he "likes to play Frisbee, go to church and AA picnics, and occasionally go out with a couple of friends [on] a 12-foot rowboat." Tr. 385. In late December 2002, plaintiff was noted to be able to do housework and go shopping. Tr. 379. In early February 2004, plaintiff reported that he had pushed a vehicle off the road. Tr. 414. Given the above activities, the undersigned finds the ALJ did not err in discounting plaintiff's credibility for this reason as well.

VI.     The ALJ Did Not Err in Evaluating the Lay Witness Evidence in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d, 503, 511 (9th Cir. 2001). An ALJ may discount lay testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir.

1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence).  In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. <u>Lewis</u>, 236 F.3d at 512.  The ALJ also may "draw inferences logically flowing from the evidence." <u>Sample</u>, 694 F.2d at 642.

Plaintiff argues the ALJ failed to give appropriate weight to the opinions of his treating physician assistant, Mr. Conover.  Mr. Conover is not an "acceptable medical source" as that term is defined in the Social Security Regulations, and thus may be given less weight than those of acceptable medical sources. <u>See</u> <u>Gomez v. Chater</u>, 74 F.3d 967, 970-71 (9th Cir. 1996); 20 C.F.R. § 416.913(a), (d) (licensed physicians and licensed or certified psychologists are "acceptable medical sources").  The opinions of Mr. Conover, therefore, are instead treated generally in the manner of other lay witnesses. <u>See</u> 20 C.F.R. § 416.913(d) (Commissioner may also use evidence from other sources to show the severity of claimant's impairment(s) and how those impairments affects his or her ability to work).

In early March 2004, Mr. Conover answered a series of questions provided by plaintiff's counsel.  Mr. Conover believed that plaintiff probably would not be able to "fulfill the functions of sedentary work," because he was concerned with "his ability to walk or stand for two hours," particularly if plaintiff had to do it "in a continuous stretch or if he had to walk any great distance at one time." Tr. 407.  Mr. Conover also felt plaintiff more probably than not would miss three or more days of work per month, most likely would need to take unscheduled breaks, and should elevate his legs for an average of one to two hours per day to limit swelling. Tr. 408.

With respect to these opinions, the ALJ found in relevant part as follows:

> Mr. Conover's opinions are not supported by the record and are inconsistent with the claimant's activities.  There is no evidence in the record that the claimant was ever told to elevate his legs. . . .

> There are no complaints of swelling before the hearing and no description of such at any time prior to the document Mr. Conover submitted to support claimant's claim.

> I accord no weight to other of Mr. Conover's assertions.  Mr. Conover provided no explanation with regard to his opinion that the claimant would miss work and would need to take unscheduled breaks.  On the contrary, the record shows that the claimant experienced no symptoms of angina since 2002, and the claimant reported in October, 2002, that he had performed "odd jobs" over the previous year, including; working on cars, raking leaves, mowing the lawn, and working in the garden. Ex. 24F.2.  Each of these activities involves a great deal of standing and walking, also contradicting Mr.

REPORT AND RECOMMENDATION
Page - 18

1    Conover's reservations about the claimant's ability to walk and/or stand for two hours at
     a time.  For all these reasons, the undersigned assigns the functioning assessment by Mr.
2    Conover little weight.

3    Tr. 24-25.  Plaintiff argues these do not constitute "germane" reasons for rejecting Mr. Conover's opinions.

4    The undersigned disagrees.

5         As noted by the ALJ, Mr. Conover is the only medical source in the record to assess plaintiff with

6    the limitations that he did.  Plaintiff argues that contrary to the ALJ's statement that there is no mention or

7    evidence of swelling in the record, there is one mention of edema in Mr. Conover's diagnostic notes.  See

8    Tr. 412.  This, however, appears to be the only mention of edema in the record, and, indeed, less than one

9    month earlier, Mr. Conover himself found no edema present. Tr. 414.  In addition, plaintiff points to, and

10   there is, no evidence in the record from other "acceptable medical sources" that support any of the other

11   limitations found by Mr. Conover.  Because the substantial medical evidence in the record is inconsistent

12   with those limitations, the ALJ therefore did not err in rejecting Mr. Conover's opinions. See Lewis, 236

13   F.3d at 511; Vincent, 739 F.2d at 1395.

14   VII.    The ALJ Erred in Assessing Plaintiff's Residual Functional Capacity

15        If a disability determination "cannot be made on the basis of medical factors alone at step three of

16   the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

17   assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A

18   claimant's residual functional capacity assessment is used at step four to determine whether he or she can do

19   his or her past relevant work, and at step five to determine whether he or she can do other work. Id.

20   Residual functional capacity thus is what the claimant "can still do despite his or her limitations." Id.

21        A claimant's residual functional capacity is the maximum amount of work the claimant is able to

22   perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

23   must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those

24   limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

25   claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

26   related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

27   medical or other evidence." Id. at *7.

28        Here, the ALJ assessed plaintiff's residual functional capacity as follows:

REPORT AND RECOMMENDATION
Page - 19

[T]he claimant retains the following residual functional capacity to: (1) lift 20 pounds occasionally, and 10 pounds frequently; (2) stand and/or walk six hours in an eight hour workday; (3) sit six hours in an eight hour workday; and (4) push and pull without limitation. Further, the claimant is limited to simple, unskilled work due to his borderline intelligence, and should avoid concentrated exposure to extreme heat due to possible aggravation of heart symptoms, purely as a prophylactic matter.

Tr. 25. Plaintiff argues this assessment was improper in light of the ALJ's errors in evaluating the medical evidence in the record, the opinions of Mr. Conover, and his own testimony. As discussed above, the ALJ did not err in evaluating the opinions of Mr. Conover or in assessing plaintiff's credibility. Nevertheless, because, also as discussed above, the ALJ did err in evaluating the medical opinion source evidence in the record regarding plaintiff's mental impairments and limitations, it is not clear the ALJ's assessment of his residual functional capacity is accurate. Accordingly, the Commissioner shall re-assess plaintiff's residual functional capacity on remand.

## VIII.   The ALJ's Step Five Analysis

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000). The Grids may be used if they "*completely and accurately* represent a claimant's limitations." Tackett, 180 F.3d at 1101 (emphasis in the original). That is, the claimant "must be able to perform the *full range* of jobs in a given category." Id. (emphasis in the original). If the claimant "has significant non-exertional impairments," however, reliance on the Grids is not appropriate.[2] Ostenbrock, 240 F.3d at 1162; Tackett, 180 F.3d at 1102 (non-exertional impairment, if sufficiently severe, may limit claimant's functional capacity in ways not contemplated by Grids).

Here, the ALJ found that because plaintiff's limitations "would not have a significant effect" on his ability to performed unskilled work, a finding of "not disabled" was directed by Grid Rule 202.17. Tr. 26-30. Plaintiff argues the ALJ's reliance on the Grids was inappropriate as he did have mental impairments

---

[2] "Exertional limitations" are those that only affect the claimant's "ability to meet the strength demands of jobs." 20 C.F.R. § 404.1569a(b). "Nonexertional limitations" only affect the claimant's "ability to meet the demands of jobs other than the strength demands." 20 C.F.R. § 404.1569a(c)(1).

that caused significant non-exertional limitations.  Plaintiff further argues that because the Commissioner failed to meet her burden of showing that he was capable of performing other jobs existing in significant numbers in the national economy, he should be found disabled at step five.

As discussed above, the ALJ erred in evaluating the medical evidence in the record concerning plaintiff's mental impairments.  It is not entirely clear, however, based on the record currently before the court and the deficiencies in the ALJ's evaluation of that evidence whether plaintiff's mental impairments are so significant as to preclude reliance on the Grids.  Thus, it also is not clear the ALJ was required to obtain the testimony of a vocational expert or to find plaintiff disabled at step five.  Accordingly, after re-evaluating the medical evidence in the record regarding plaintiff's mental impairments, the Commissioner on remand also shall re-consider whether reliance on the Grids at step five is appropriate, or whether the testimony of a vocational expert is required.  Needless to say, the undersigned also finds it is not at all clear at this point that plaintiff is disabled at step five.

IX.    Development of the Record

Plaintiff argues the ALJ failed to develop the record by not requesting additional academic testing in light of Dr. Bremer's opinion that such testing was needed to support a diagnosis of a learning disorder. An ALJ has the duty to fully and fairly develop the record and to assure that the claimant's interests are considered. Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  However, an ALJ's duty to further develop the record "is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001).  Here, while Dr. Bremer did feel plaintiff's academic skills were "quite limited" and that academic testing would be needed to support a diagnosis of learning disorder, he did not state that his opinion would be incomplete without such testing, because, as discussed above, the record as a whole is at best mixed regarding whether or not plaintiff had a learning disorder or, if he did, whether or not it was severe, and because this matter is being remanded in part to re-consider that issue, should the Commissioner find further academic testing is required, such testing shall be obtained.

X.    This Matter Should Be Remanded for Further Administrative Proceedings

The court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292.  Generally, when the court reverses an ALJ's decision, "the proper course, except

in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because, as discussed above, issues remain as to whether or not plaintiff's mental impairments and limitations are disabling, this matter should be remanded to the Commissioner for further administrative proceedings.

Plaintiff requests that if this matter is remanded for further administrative proceedings, the court should order that it be assigned to a different ALJ. The requirements of due process demand "impartiality on the part of those who function in judicial or quasi-judicial capacities." Schweiker v. McClure, 456 U.S. 188, 195 (1982). Hearing officers who decide social security claims are presumed to be unbiased. Id. This presumption, however, "can be rebutted by a showing of conflict of interest or some other specific reason for disqualification." Id. The burden of establishing such a disqualifying interest "rests on the party making the assertion." Id. at 196. That party must show "the ALJ's behavior, in the context of the whole case, was 'so extreme as to display clear inability to render fair judgment.'" Rollins v. Massanari, 246 F.3d 853, 858 (9th Cir. 2001) (citing Liteky v. United States, 510 U.S. 540, 555-56 (1994)); see also Bunnell v. Barnhart, 336 F.3d 1112, 1115 (9th Cir. 2003) (actual bias, rather than "mere appearance of impropriety," must be shown to disqualify ALJ).

Specifically, plaintiff asserts the ALJ is not capable of fairly considering his disability claim in light of the ALJ's comments concerning his credibility. As discussed above, however, the ALJ did not err in assessing plaintiff's credibility. In addition, plaintiff has not shown that the ALJ is imbued with the kind of bias or conflict of interest noted above that would warrant a court-mandated transfer to another ALJ. Thus, the undersigned declines to require such a transfer on remand, though the Commissioner certainly may be

1   free to do so on her own if she chooses.

2

3                                      CONCLUSION

4          Based on the foregoing discussion, the court should find the ALJ improperly concluded plaintiff was

5   not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for further

6   administrative proceedings in accordance with the findings contained herein.

7          Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

8   the parties shall have ten (10) days from service of this Report and Recommendation to file written

9   objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

10  objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit

11  imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **February 17,**

12  **2006**, as noted in the caption.

13         DATED this 19th day of January, 2006.

14

15

16                                            Karen L. Strombom
                                             United States Magistrate Judge
17

18

19

20

21

22

23

24

25

26

27

28

REPORT AND RECOMMENDATION
Page - 23